THE STATE, *ex rel.* THE ST. JOSEPH AND DENVER CITY RAILROAD CO., v. THE COMM'RS OF NEMAHA CO.

1. AID TO RAILROADS—*Validity of Statutes.* The acts of the legislature of the State of Kansas authorizing counties and cities to subscribe for stock in railroad companies, and issue bonds in payment of the stock so subscribed for, are constitutional and valid. [Per VALENTINE, J., and KINGMAN, C. J., following *Comm'rs of Leavenworth Co. v. Miller*, ante, p. 479.]

2. [BREWER, J., dissenting, files an opinion reviewing the question and authorities, *post*, p. 549.]

*Original Proceedings in Mandamus.*

THE principal question in this case was the same as that decided in the case of *Comm'rs of Leavenworth Co. v. Miller*, (ante, p. 479,) namely, the constitutionality of ch. 12, Laws of 1865, authorizing cities and counties to subscribe to the capital stock of railroad corporations and issue bonds in payment of such subscriptions. The facts are as follows: On the 8th of May, 1866, an election was held in Nemaha county, by order of the board of county commissioners, at which the qualified electors were authorized to vote upon the question whether the county of Nemaha should subscribe $125,000 to the capital stock of the *St. Joseph & Denver City Railroad Co.* A majority of the votes cast were in favor of the proposition. On the 3d of January, 1870, the board of county commissioners, pursuant to the authority given by said election, subscribed the said sum of $125,000 to the stock of said company. The proposed route of said road designated in the notice for the election traversed Nemaha county, and it is conceded that said railroad has been constructed through said county. After making said subscription the county commissioners refused to issue the bonds of

the county in payment thereof. The said railroad company filed a petition or relation in this court, in the name of *The State*, for a mandamus to compel the commissioners to issue the bonds of their county. The petition alleged—" That said *St. Joseph & Denver City Railroad Com-* " *pany*, the relator herein, has complied with each and all " of the conditions upon which said subscription was " made; and that after said conditions had all been so com- " plied with by relator, said *Board of County Commissioners* " refused to receive said stock, although the same was duly " tendered to it by relator, and also refused to issue said " bonds, or to levy any tax to pay the same, or the interest " thereon, as required by the terms of said subscription." On filing the petition the relator moved for an *alternative* writ of mandamus, which motion was resisted by the defendants.

(References to authorities cited by counsel are very numerous, and being all cited in the opinion in the preceding case of *Comm'rs of Leavenworth Co. v. Miller*, they are omitted from the briefs.)

*Jeff. Chandler*, for the relator :

1. The subscription made by defendants was made under and by virtue of an act of the Legislature of the State of Kansas; which act at the time said subscription was made, was in full force and effect. (Laws of 1865, p. 41.) Said act is constitutional, as is shown by the following: 1st, Acts, in all material respects the same as the act in bar, have been sustained in nearly all of the Supreme Courts of the various States, as well as by the Supreme Court of the United States. 2d, Before the court can declare said act unconstitutional, it must be shown to be a clear and palpable violation of some provision of the constitution of Kansas. A doubt is not

sufficient. 3d, It cannot be declared void merely because the court regard it as in conflict with natural justice. 4th, Nor can it be so adjudged on the ground that the tax which it provides for the payment of the bonds is not for a public purpose; as the Legislature is the sole judge of this. 5th, Nor can it be contended with reason that said act is in conflict with that provision of the constitution of the State of Kansas which provides that the State cannot be a party to internal improvements.

2. The subscription of said stock by the defendant, and its promise to pay for the same in its bonds, is a contract with the relator, such as has been held by this court in the case of *Burnes v. The City of Atchison,* 2 *Kas.*, 454, is authorized by the laws of this State; and this court cannot by a later and subsequent decision impair the obligation of said contract made upon the faith of laws as expounded and construed by this court.

3. The board of county commissioners were exclusively authorized to determine whether the law was complied with; and having so determined, and made the subscription, they cannot now open that question.

And when the act is unconstitutional, if the subscription is in fact made, the county must pay. (9 Ind., 83; 32 Penn. St., 218, 229, 232, 235.)

4. The expression "internal improvements," is technical in politics, and was adopted to indicate improvements made within the limits and jurisdiction of the States, and so claimed not to be in the power of the United States. It was never used to indicate improvements made by private persons or private corporations. On the contrary this term originated and was used to apply to works done by the *public* alone, and for the *public.* See acts of congress relating to internal improvements.

[*B. F. Stringfellow*, also for the relator, in support of the motion for a mandamus, filed an elaborate argument in favor of the validity of ch. 12, laws of 1865, and reviewing at length the cases in 20 Michigan, 452, and 25 Wisconsin, 167, which decide adversely to the constitutionality of legislation authorizing municipal aid to railroads. His argument is too long to insert entire, and it cannot well be abbreviated.]

*Clough & Wheat*, and *J. E. Taylor*, for defendants:

1. It is not within the corporate powers of a county to subscribe to the capital stock of a railroad company, or to issue bonds of the county in payment, or in pursuance of such subscription, or to levy a tax to raise funds for the purpose of paying such bonds; and the several acts, and parts of acts, of the legislature of the State of Kansas which purport to authorize counties to subscribe to the capital stock of railroad corporations, and to tax private property to raise funds with which to pay for such stock, are *void*. 1 Ohio St., 86; 19 Wis., 624; 25 Wis., 167; 57 Pa. St., 438; 20 Mich., 452.

So far as any matter material to this case is concerned, the House of Representatives and Senate of this State are only vested with *legislative* power by § 1, of Art. 2, of the Constitution of this State. And we submit that the enactment of so much of ch. 12, laws of 1865, and ch. 24, laws of 1866, as authorizes counties to subscribe for stock in a railroad, and issue bonds in payment thereof, is not, and was not, an exercise of *legislative* power.

2. By § 8 of Art. 11 of the constitution, the State is forbidden to be a party to the carrying on of any work of internal improvement. Whatever a county does under the laws of the State, it does as an instrument of the State. A railroad is an *internal* improvement within the

35

meaning of said § 8, and not a *public* improvement within the meaning of § 5, of art. 11 of our constitution. By force of those two sections, as well as from the nature of the case and the meaning of the words, there is an essential difference between *public* and *internal* improvements, recognized by the law of this State, and in general business throughout the country.

The railroad, if built, and the capital stock of the company owning it, is, and will be *private* (not *public*) property. Such railroad will not be for public use like a state-house or court-house, or public highways and bridges thereon, where all persons at proper times, and for proper purposes may go without fee or reward, as the public use and convenience may require. But, on the contrary a railroad is only to be used, and only intended to be used, when and as such use is to be fully paid for. The public have not, in any corporate or other capacity, any more right to use, or to the use of, a railroad, than any individual has to the use of conveyances of common carriers; and if not, how can the construction thereof, and the appropriation of property therefor, be for a *public* use.

3. The acts authorizing the subscription of stock, and issue of bonds, authorize *taxation* to pay said bonds. We submit the effect of said statutes is, if they are not void, to transfer the property of one person to another *without* compensation, which cannot be done by legislative enactment, even *with* compensation. Every person has a vested right to retain his own property for his own use, subject to the right of taxation for *public* use, and to the right of eminent domain, neither of which is called into requisition, so far as any question in this case is concerned. A party cannot be deprived of a vested right by legislative enactments.

Where the right of eminent domain stops, there the

right to incur any obligation for the public ends. (1 Ohio St., 96; 2 Kent's Com., 339, 407.) The effect of the right of eminent domain against the individual " amounts to nothing more than a power to oblige him to sell and convey, when the public necessities require it." Cooley on Const. Lim., 559, note 4, and cases there cited. And therefore, an act permitting private property to be taken for public use, without requiring compensation to be made, and making *provision* therefor, is void. 4 Ohio St., 167, 494; 12 Wis., 213; 31 Mo., 181; 6 Wis., 605; 34 Ill., 203; 20 La. An., 497.

4. The relator claims that the defendants subscribed, on the 3d of January, 1870, for $125,000 of its capital stock, in pursuance of an election held on the 8th of May, 1866. This election was called, and the voting thereat was had, while ch. 12, laws of 1865, and the amendatory act, ch. 24, laws of 1866, were in force. The votes cast, election held, and orders of the board of commissioners of Nemaha county made, in 1866, did not, either themselves, or with any other matter alleged, (other than the pretended subscription relied on,) constitute a contract, or render the county liable in any manner to any railroad company, or make it the duty of said county to subscribe to the capital stock of any company, or to issue any bonds of the county, or to levy any tax. See the opinion of this court in the case of *The L. G. Railway and Trust Co., and U. P. Railway Co., v. The Comm'rs of Davis Co.,* 6 Kas., 256.

5. A party asking for a writ of mandamus, must show an obligation on the respondents to perform the act, and that the party asking for the writ is legally entitled to have such act performed. And also, that the party against whom the writ is asked to be issued, is in default in the performance of a legal duty. 3 Kas., 88; 25 Maine, 333; 9 Mich., 328; Moses on Mandamus, 204.

The State, ex rel., v. Nemaha County.

The opinion of the court was delivered by

VALENTINE, J.: This is an application for a writ of mandamus brought originally in this court by the Saint Joseph and Denver City Railroad Company to compel the Board of County Commissioners of Nemaha county to issue $125,000 of the bonds of said county to said railroad company in payment for a like amount of the capital stock of said railroad company for which it is alleged the county has already subscribed. Many important questions are involved in this case, one of which is the constitutional validity of an act of the Legislature approved February 10th, 1865, authorizing counties and cities to make such subscriptions, and to issue their bonds in payment therefor. (Laws of 1865, ch. 12, p. 41.) This question has been very ably argued on both sides, and if we err in our decision it is our own fault. Our decision is in the affirmative. We think the said act is constitutional and valid.

Before this case was argued or submitted to us, a case from Leavenworth county involving the same question was submitted; (*The Board of County Commissioners of the County of Leavenworth v. Edward Miller*, ante, p. 479;) and since this case was submitted another case from Morris county supposed to involve the same question has been submitted; (*Morris, et al., v. The Comm'rs of Morris County*, post, p. 576.) So far as the constitutional validity of said act, or of similar acts, is concerned, we have considered all of these three cases together; and we now render our decision in this case and in that of *Commissioners of Leavenworth Co. v. Miller* at the same time. In the case last mentioned we give our reasons at length for holding said ch. 12, laws of 1865, to be valid, and it is not necessary to repeat them here. In this case we care-

fully refrain from expressing any opinion at this time upon the other questions involved. We shall reserve the consideration of such questions until the return of the alternative writ of mandamus, when an issue may be formed and the facts found, so that we may know the exact questions in the case.

The alternative writ is allowed.

KINGMAN, C. J., concurring.

BREWER, J., *dissenting:* The preceding case of *Commissioners of Leavenworth County v. Miller*, (ante, p. 479,) was submitted to this court before I came upon the bench; but before final decision thereof, and since I became a member of the court, the principal question in said case, which is also the principal question in this case, has been fully argued anew—both cases involving the constitutionality of the act of February 10th, 1865, authorizing municipal aid to railroad corporations. While taking no part in the decision made in the case of *Comm'rs of Leavenworth Co. v. Miller*, in which the principal opinion is filed, deciding this case as well as that, (ante, p. 488,) I am constrained to say that, upon the abstract questions involved in this case, I am unable to agree with my brethren.

Regarding the questions simply in the light of authority, it is useless to deny that the great weight is with them. The highest courts of most of the States have pronounced in favor of the validity of acts like the one in question, some upon one ground and some upon another. Some of the decisions are based upon reasons wholly inapplicable here. As for instance, in those states where it is held that because the State has power to build railroads, it can delegate to any municipality within it the like power, and authorize it to construct either in

whole or in part, such internal improvements. While I concede that the great weight of authorities—looking at it simply in the light of majorities—is with my brethren, yet there has ever been a vigorous and earnest dissenting. The question will not remain settled. Like Banquo's ghost, "it will not down." While the earlier cases do not discuss the question in the light of the principles upon which such legislative action must be based, there has been, ever since, great sheltering behind the accumulating authorities. "Whatever is, is right," is practically the idea upon which the late decisions rest. Because *so many* legislatures, *so many* executives, and *so many* courts have recognized this species of legislation, it must be valid. If that be the rule universally adopted, accumulating wrong will never be disturbed in its illegally acquired power.

But it is said that this question has already been settled in this court, and the maxim, *stare decisis*, is invoked in its behalf. I recognize the binding obligation of that maxim, and if the question had once been fully considered and determined in this court, I should have no desire to re-examine it. The feverish anxiety manifested throughout the State, by the profession and the community, in reference to these pending cases, is evidence that they, at least, do not consider the question a settled one in this court. And before examining the question upon principle, let me look briefly at the cases heretofore decided by this tribunal, which have been claimed as precedents in this matter. " *Burnes v. The City of Atchison,*" decided by this court in March, 1864, and reported in 2 Kas., 454, is the first case relied on as deciding, or at least affecting this question. The territorial legislature granted a charter to the city of Atchison. By section 30 thereof, the city was authorized to subscribe for stock

in a railroad, and by section 31 to issue bonds in pay-
ment of such subscription.  By section 11, the common
council had authority to levy taxes not exceeding one
per cent.  The city subscribed stock and issued bonds..
In 1859 the council levied a tax of one per cent. for gen-
eral revenue, and also one per cent. for payment of in-
terest on bonds issued.  An injunction suit was brought to-
restrain the collection of these taxes.  This court decided
that there was a plain and adequate remedy at law, and
that, therefore, injunction would not lie.  So far the
decision is authority, and no farther.  The opinion of
the court, as given by Mr. Justice KINGMAN, went beyond
this, and declared that the tax for payment of the interest
on the railroad bonds was void, as the full power granted
in the charter had been exhausted in the levy for general
revenue; and going still a step beyond, declared, that
though the tax was void, the bonds were valid.  This,
which was purely an *obiter dictum*, being a second degree
removed from the point decided, can hardly be considered
as an authoritative ruling by this court to be followed on
the maxim of *stare decisis*.  But again—for this consid-
eration may seem technical where a grave constitutional
question is up for determination—the opinion expressed
by Mr. Justice KINGMAN as to the validity of those bonds,.
may have been correct; and yet throw no light upon the-
question we have to decide.  The territorial legislature
granted the charter which authorized the subscription.
The powers of that legislature were not derived by grant
from the people of the territory, nor restricted by any
constitutional limitations other than those contained in
the federal constitution, and were, therefore, in this
direction, unlimited.  This is the reason given by the
learned justice for declaring the bonds valid.  It is a
reason supported by authority.  Chancellor KENT in his

Commentaries, vol. 1, p. 384, says that "the general sovereignty existing in the government of the United States over its territories is founded on the constitution, which declares that congress 'should have power to dispose of and make all needful rules and regulations respecting the territories or other property belonging to the United States.'" And again: "It would seem from these various congressional regulations of the territories belonging to the United States, that congress have supreme power in the government of them, depending on the exercise of their sound discretion." And further along, after speaking of the project of colonizing the uninhabited region lying west of the Rocky Mountains, he uses this language: "It would be a long time before it would be populous enough to be created into one or more independent States; and in the meantime, upon the doctrine taught by the acts of congress, and even by the judicial decisions of the supreme court, the colonists would be in a state of the most complete subordination, and as dependent upon the will of congress as the people of this country would have been upon the king and parliament of Great Britain if they could have sustained their claim to bind us in all cases whatsoever."

The failure of the distingushed chancellor as a prophet, in nowise detracts from his reputation as a jurist. His opinion as to the unlimited power of congress over the territories, is sustained by judicial decisions. It was delegated by the organic act to the territorial legislature. The absence of any constitutional restrictions on this power, was the reason given by the learned justice for sustaining the validity of those bonds; (2 Kas , pp. 485, 486.*) But this reason contains the very question we

[ * In *Burnes v. City of Atchison*, 2 Kas., Mr. Justice KINGMAN, in his opinion, (pp. 484, 485,) quotes § 24 of the Organic Act, and then says: "This provision conferred upon "the *Territory* all the legislative power of a State government, *unrestricted by its constitu-*

have here to decide.   The power of the legislature is no longer unlimited or indefinite.   The people with whom rests the complete sovereignty, have adopted an organic instrument, a State constitution, which creates legislature, courts, and executive, and fixes and determines what powers each may exercise.   They have thus created constitutional limitations.   How far do these constitutional limitations affect the   assumed   power?   That is the present question—a question which could not arise in the former case, because the bonds were issued before these constitutional limitations  were   imposed.   The case of *Butcher v. The City of Atchison*, 3 Kas., 104, arose upon similar bonds, and is subject to the same criticism.

The case of *The State, ex rel. Hurd v. The Mayor, etc., of Leavenworth*, which was before this court in 1868, went off in this way :  An alternative writ was granted, commanding the city to show cause why a mandamus should not issue, compelling it to levy a tax for the payment of coupons of a railroad bond issued by it.   The city made answer, that not desiring to contest the matter with the relator, it had, since the issue of the writ, tendered him the full amount of the coupons.   This answer was, for some reason which the record does not show, stricken out, and leave given to file another.   No other answer was filed, and no other proceedings or orders were had in the case.   No opinion was ever filed.   It seems to me the most strenuous advocate of the validity of these bonds would hardly call this a precedent, and binding upon this court.

"*tion* except in the particulars above stated." And on p. 486, he says: "We have already seen that the (Territorial) Legislature which passed the charter in question, (Private Laws of 1858, ch. 77, p. 172,) *was invested with all the powers of a State Legislature without any constitutional restriction affecting the question under consideration*," (that is, the question of the authority of the City of Atchison, under §§ 30, 31, of the city charter, to subscribe for stock in a railroad company and issue bonds in payment of such subscription.)—REPORTER.]

The way being then, as I conceive, fairly open for an examination of this question upon principle, upon what, let me inquire, must such legislative action rest for support? I propose to look at it as entirely a new question, and unembarrassed by prior adjudications, here or elsewhere. I feel more free to examine it in this manner, for the reason that my opinion, as it differs from that of the majority of the court, carries with it no authority.

All power resides with the people. The ultimate sovereignty is with them. The constitution is the instrument by which some portion of that power is granted to different departments of the government. Power is not inherent in the government, from which some portion is withdrawn by the constitution. The object of the constitution of a free government is to grant, not to withdraw, power. This is the primal distinction between the constitutions of the old monarchical governments of Europe, and those of this country. The former indicate the amount of power which the people have been enabled to withdraw from the government; ours the amount of power the people have granted to the government. I know it is common in marking the distinction between the federal and State governments, to speak of the former as a government of enumerated or delegated powers, and of the latter as one of non-enumerated or general powers. The distinction is obvious; the language appropriate. It helps to make prominent and clear the limited sphere in which the federal authorities may rightfully act. But though the State government is not one of enumerated and specific powers—that is to say, the legislature is not, by the terms of the constitution, empowered to legislate upon certain named and specific matters only, it is nevertheless a government of granted powers. The constitution creates legislature, courts, and executive. It

defines their limits, grants their powers. It should always be construed as a grant. The habit of regarding the legislature *as inherently omnipotent*, and looking to see what express restrictions the constitution has placed upon its action, is dangerous, and tends to error. Rather regarding first those essential truths, those axioms of civil and political liberty upon which all free governments are founded, and secondly those statements of principles in the Bill of Rights upon which this governmental structure is reared, we may properly then inquire what powers the words of the constitution, the terms of the grant, convey. It is true, many of the provisions of the Bill of Rights are so limited in their scope, so certain, clear, and well-defined, that their full force is easily understood and applied without difficulty, whether we consider them as restrictions upon inherent, or conditions of granted, power. Such is section 16: "No person shall be imprisoned for debt except in case of fraud." The full extent of this provision is tangible, definable. It reaches to a single ill. Full effect can be given to it without difficulty. But there are provisions which are not so limited, certain, and definite. Such are section 1: "All men are possessed of equal and unalienable natural rights, among which are life, liberty, and the pursuit of happiness;" and the first sentence of section 2: "All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit." Looking at these simply as limitations upon existing power, as restrictions upon an otherwise absolute supremacy in the legislature, and they seem little more than "glittering generalities." But when we regard them as the conditions upon which legislative power is granted—as the foundation principles upon which all legislative action

must be based, and a disregard of which renders such action void, they become substantial, prominent, and vital. The very first condition of legislative action is, that such action shall be for the equal benefit and protection of the people. Impartiality must be the unvarying rule. True, it is not possible that all legislation should, in its results, operate equally upon all classes and industries. Revenue must be collected, and human skill has not yet been able to devise a system by which its burdens shall be thrown with mathematical exactness upon every person and all property. Keen, sharp-sighted men, watching all points, often adjust their business to take advantage of these unforeseen or apparently unavoidable inequalities of legislation, so as to make large profits off from the less watchful public. But this is an evil incident to the imperfections of all human action, and is very different, fundamentally different, from that which exists in that legislation whose apparent object and manifest result is to add wealth to the few by taking it from the many, or to give by law to one man that which another has gained by labor. I cannot do better than to quote the forcible language of Mr. Justice RANNEY, in his dissenting opinion in *Cass v. Dillon*, 2 Ohio St., 628: "First among them in order, and first also in importance, is the great political truth that sovereignty belongs only to the mass of the community; or as expressed in the Bill of Rights, 'all political power is inherent in the people.' In extended communities, for obvious reasons, the direct exercise of this power becomes impracticable, and this has led to an institution of a subordinate agency called the government, entrusted for the time being with the exercise of such sovereign power, and such only, as is clearly expressed in the instrument of delegation—the constitution. This seems very plain, almost too plain,

to need this formal statement; and yet it is forgotten or
disregarded, as often as the argument is advanced that a
legislative act can only be treated as inoperative when
expressly prohibited by some clause or section of the
constitution. The question can never be, What might
the people, the source of sovereign power, have done or
authorized to be done in their name and behalf? but,
*What have they authorized to be done?* As well might any
other agent acting under written instructions claim to be
authorized by his principal to do whatever he was not
expressly prohibited from doing, however foreign it
might be to the power actually conferred. Hence this
court has held that it is always legitimate to insist that a
legislative enactment, drawn in question, is invalid,.
either *because it does not fall within the general grant of
power* to that body, or because it is prohibited by some
provision of the constitution: and if the former is made
to appear, it is as clearly void as though expressly pro-
hibited." 1 Ohio St., 86.

Add to this the idea that the general principles enun-
ciated in the Bill of Rights are the conditions upon which
power to make laws is granted to the legislature, and we
have rules by which to determine the constitutionality of
a law. Let us apply these rules to the question before
us. And at the outset, it is worthy of remark that inas-
much as these laws operate to take money away from the
citizen—taken, it is true, in the way of taxes, but then it
takes money to pay taxes—they who assert their validity
should show warrant for them. The taxing power is re-
lied on to sustain these bonds. Payment of both interest
and principal is secured by means of taxes, and this is
made the pivotal fact upon which to rest their validity.
The power of taxation is a legislative power, and by the
grant in the constitution,.vested in the legislature. When

and to what extent this power shall be exercised is committed to its discretion.   Having exercised that discretion there is no appellate or revisory power in the courts to re-examine the question.   Discretion is not the subject of review.   The only limitations are in the manner of the apportionment, and that it be for a public purpose. Chief Justice MARSHALL, in *McCullough v. Maryland,* 4 Wheat., 428, says : " The only security against the abuse of this power is found in the structure of the government itself.   In imposing a tax, the government acts upon its constituents.   This is in general a sufficient security against erroneous and oppressive taxation.   The people of a State, therefore, give to their government the right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limit to the exercise of the right, resting confidently on the interest of the legislature, and the influence of the constituents over their representatives, to guard them against its abuse."   If it were true that the influence of the constituent over the representative was sufficient security against abuse, it would be the only unlimited power that is thus safe.   This language of C. J. Marshall is quoted frequently, and the idea it conveys pressed with exceeding force in many of the opinions pronounced upon this question.   There is a sense in which it is correct, and another in which it is not.   The power of the legislature is not restricted as to the *amount* of the levy ; it is as to the *object.*   In regard to the former, it has a discretion which is not the subject of judicial review; its decision is final.   Whether the general levy for a current year shall be three mills or three cents, is a matter into which the courts may not inquire.   No matter how clearly it may appear that the levy is inadequate to supply the legitimate demands on the public treasury, or to furnish

the means for the appropriations made; or on the other hand that the levy will not merely pay all the appropriations and supply all possible demands, but also fill the vaults of the treasury with idle millions, while it bankrupts the taxpayer, there is, nevertheless, no scope for the interference of judicial power. Nor will the validity of the tax be affected, or the door opened to judicial inquiry as to its validity, by the fact that some of the appropriations the legislature has made, or may make, are for purposes which the State may not seek State taxes are collected ordinarily, by virtue of an act levying a certain number of mills on the dollar for general revenue. Appropriations are made by other and distinct acts. Now, in such cases, there is no such relation between the levy and the appropriation that the mistakes of the latter can affect the validity of the former. The courts cannot restrict the legislature from levying taxes, because they see it has, or fear it will, squander the funds of the public treasury. To illustrate: The last legislature passed an act levying three and five-sixths mills on the dollar for general revenue. The State is by the constitution forbidden to be a party to any works of internal improvement. Suppose the same legislature had passed an act appropriating $100,000 for the construction of a canal from Lawrence to Topeka. This act would, without question, be unconstitutional and void. But its unconstitutionality would in no manner affect the validity of the general tax law referred to. The courts would have no power to reduce the levy, nor forbid its collection. The legislature has power to levy taxes for general purposes. Having such power, its determination as to the amount of the levy is final, and beyond investigation. In this sense, the quotation from C. J. Marshall correctly states the law. But where the relation between the levy and the appro-

priation, the tax and its object, is made specific and certain, then a different rule prevails—the determination of the legislature is not final. The influence of the constituent over his representative is not the only restriction. Courts may inquire, and where the appropriation is one the object of which the government may not rightly pursue, they may strike not merely at the appropriation, but also at the tax. To pursue the illustration just used: Suppose the legislature had passed an act appropriating $100,000 to construct a canal from Lawrence to Topeka, and levying a tax of one mill on the dollar to raise such amount. Here the relation between the levy and the appropriation, the tax and the object sought, is obvious, specific, and certain. The unlimited power of the legislature over taxation would not uphold the appropriation, or even the tax; but the unconstitutionality of the appropriation would destroy both it and the tax. Probably the difference between the two cases is less a difference of principle than of application. The power of taxation is limited by the end sought to be accomplished. Taxation is never the end for which government acts; it is only the means used to accomplish some end. In order to determine the validity of any act, the primary inquiry should be directed to the end sought, not the means used. Undue prominence has been given in the discussions upon these bond questions to the power of the legislature over the means of taxation. If the end is one which government may rightly seek, and the means used not forbidden, the act is valid. If, on the contrary, the end is one which government may not rightly pursue, it matters not what means are used, the act is void. This distinction is considered by the supreme court of the United States in *McCullough v. Maryland*, 4 Wheat., 316, and *Osborn v. United States Bank*, 9 Wheat., 859. In these cases

the power of congress to incorporate the United States
Bank was sustained, and upon this ground: The power
to create corporations is not, in terms, granted by the
constitution to congress; but as Chief Justice Marshall
held, the creation of a corporation is a means, not an end.
The end sought was the collection and transmission of
the revenues and funds of the government. The means
used was the bank. The end was one the government
might rightfully pursue. The means were not forbidden.
Therefore, the act was valid. But if there had been
simply the charter of a bank for the transaction of pri-
vate business, and without any reference to the collec-
tion and transmission of the public revenue and funds,
it was conceded such a charter would be void as beyond
the powers of congress. Yet in both cases the charter-
ing of the bank—the mere act of creating a corporation—
was the same. The end to be accomplished rendered
one valid; the other void. Just so is it in the case before
us. The mere fact that the means used, taxation, is a
legislative power, and is vested in the legislature, helps
but little in the determination of this question. The
main inquiry is, what is the end sought? The conces-
sions which most supporters of the legislative power, as
respects taxation, make, that it must be for a public pur-
pose, is, when rightly considered, a recognition of the
principles I have been asserting. For the machinery
employed, the means used, the mere levying and collect-
ing of the tax, is the same, whether the money thus
raised is to be used in building a state house or private
residences. What is the end sought, what is the manifest
object and effect of these laws? Taxation simply places
the money in the public treasury. Its power goes no
further. The appropriation of the money discloses the
end and object. That end is the use of the public moneys

36

to build one private industry. It takes money which comes from and belongs to all, for the capital of the business of the few. It takes public funds to build railroads, which, when built, belong to private individuals, and are managed for purposes of private gain. A and B desire to build a railroad between two points, but have not sufficient means. It is both pleasant and profitable, they imagine, to be the proprietors of a railroad. Ordinarily, when men think of embarking their capital in any enterprise, and have not means sufficient to carry it through, they seek the co-operation of other men with capital, till enough means are secured; or, failing to secure that, abandon the undertaking. But building railroads is done in a different way. The counties, cities, and towns touched, or whose interests may be supposed to be affected by the proposed road, are induced to issue bonds to furnish the needed capital. A and B, or the corporation which they have formed, receive the bonds, sell them, and out of the proceeds, with such capital as they have, or can raise by mortgages, build the road. Thus an important business is commenced. A great industry is built up. But how? By the capital mainly furnished by the people of those municipalities. Take out of this transaction the means used to accomplish the end sought, the machinery of taxation (and henceforward through this argument I shall consider the question independent of the matter of taxation,) and pass a law to accomplish that end directly, and what would it be? Simply this, *a law that every citizen in those municipalities should take a certain proportion of the money and property he has, by his own labors, been able to accumulate, and pass it over to A and B and their corporation, to help the latter build their own road.* Power to enforce a contribution like this is not limited by the amount demanded. If the legisla-

ture has power to enforce a contribution of one dollar upon each individual, it has of one thousand dollars. Amounts never make principles. Now, how can a law be considered as based upon " equal protection and benefit" which takes *from all the citizens* the means for starting *one* person or corporation in business.

But it may be said that while a law authorizing a donation of bonds is open to this objection, a law like the one before us, which simply provides for the issue of bonds *in payment for stock,* is not. For it is said, " The people receive an equivalent for their money, in the same manner that they do when they pay for brick or stone to build a court house, or when they pay salaries to judges or other officials. Nothing is given. It is a mere question of purchase and sale. The municipality becomes a stockholder, upon the same terms and with the same rights and privileges as other stockholders. It will receive its share of the profits. It always does." This, it is true, may in theory at least, be a good answer to the objection just made to the validity of municipal aid to railroad corporations in cases where stock is issued for the bonds, but only in such cases. These cases are, however, open to another serious objection. That personal independence which we understand to be the unquestioned right of every citizen of a free government, that " pursuit of happiness " which is the guarantied right of our constitution, gives to every one, among other things, the right to pursue such avocation, and to employ one's means in such business as personal choice shall dictate. The legislature may not say to one, you must be a merchant; to another, you must enter a professional life; to this one, you must be a ditch digger or a hod carrier; and to that one, you must be a farmer. The choice of occupation is beyond legislative power. No more can it

say to one, you must invest your means in a manufac-
tory; to another, in a hotel; to a third, in mercantile
business, and so on. A citizen has the uncontrollable
right to invest his means in any business he chooses, not
*malum in se* nor *malum prohibitum*. Now a law which
compels a citizen to invest his means, whether little or
much, part or all, in a railroad enterprise, even though
it secure to him his share in the profits of that enterprise,
trespasses on this right. It will not do to say that a rail-
road is a public benefit, therefore it is a public benefit
which is sought, and therefore public funds may be used.
Public benefit will not of itself support an appropriation
of public moneys. If it did, no man's property would
be safe. For there is no honorable private enterprise
which is not also a public benefit. There is something
more than poetic fancy in the saying, " Whoever makes
two blades of grass to grow where there was but one be-
fore, is a public benefactor." It is sober prose and liberal
truth that every one who by his industry adds to the
sum of those things which contribute to human prosperity
and happiness, confers a public benefit. The interlacings
of society are so varied and far-reaching, that, by a uni-
niversal law, the prosperity of one contributes to the wel-
fare of all; the building up of one industry is a blessing
and benefit to all. Public benefit by no means implies
public purpose or public use. A mere private purpose
in a private enterprise, and for private use, oftentimes
results in a far wider and greater public benefit than a
public purpose seeking public use, through public agents.
A. T. Stewart, in building up his colossal mercantile
business, has conferred a greater public benefit on New
York than many of the purely public enterprises of the
city. That great public benefits result from the building of
a railroad, no one will question. So they do from the run-

ning of a line of steamboats, the building of a hotel, the
erection of a manufactory, the establishment of a daily
newspaper.   It is also true that the larger the work, the
greater the public benefit.   A great thoroughfare, like
the Kansas Pacific is more a public benefit than a short
line, such as the Leavenworth and Atchison railroad.   A
like difference exists between the Metropolitan Hotel, of
New York, and a country tavern—between the New
York *Daily Tribune,* and one of our local papers.   But
questions of delegated power are not determined by
amount of probable benefits.   If the legislature has power
to appropriate the public funds to the larger work, it has
to the smaller, and every work or industry which the
passion or whim of a sitting legislature may choose to
aid, may be thrown as a burden for years upon any com-
munity, because every one carries with it some measure
of benefit to the public.

Public purposes and public uses will justify an appro-
priation of the public funds, and it is claimed that a rail-
road is a public highway, and therefore subserves the
public use.   It is difficult to see in what just sense a rail-
road can be said to be a public highway.   It is not public
in the sense that the ownership of the highway, and other
property appertaining to the railway, is in the public.
Both the road and the appointments are private property.
All are subject to taxation.   No deduction is ever made
on the ground that it is in whole or in part public prop-
erty.   The road-bed and right of way are not open to the
use of the public.   The company may fence its right of
way, and remove therefrom any of the community,
(though his money, in the shape of taxes, has paid in part
for the road,) as a trespasser.   Cattle straying on the
track are trespassing, and the company killing them is
liable only for gross negligence.   (*U. P. R. W. Co. v.*

*Rollins*, 5 Kas., 167.) Every man can go upon a public highway, and use it as a highway in any manner his pleasure may dictate.

But it may be said the railroad is a peculiar kind of highway, designed for the use of only a particular kind of vehicle. Granted. But the community may not use that highway with that vehicle. Only the corporation owning the track has the right to place any vehicles upon it. The Atchison, Topeka & Santa Fe railroad company cannot, without permission, run their cars and engines upon the track of the Kansas Pacific road. And so universally. The use of a railroad is limited not only to the kind of a vehicle for which it is designed, but to the vehicles of the company which owns the road. It might perhaps be said that a highway which is limited to the use of a particular kind of vehicle, and free to all having such vehicles, was a public highway; but when the highway is limited to one kind of vehicle and to the use of one corporation or individual, it seems wondrous hard to call it a public highway. But the community have a right to travel and have their goods transported in the cars which the company runs upon its track. But this is incident to the business the corporation is engaged in, no matter in what manner that business is carried on. Whoever engages in business as a common carrier, must hold his carriages open to all. This is true of all common carriers, and is not a peculiar feature of railroads. Steamboats, stages, expresses, are free to all. So also are teams, drays, hacks, and omnibusses, when used as common carriers. It is also true in other cases of bailment. If the railroad companies should take their engines and cars and run them on the public roads—and that steam may be used as a means of propelling vehicles on those roads ere long, is by no means improbable—en-

gaging in the business of common carriers, they would still be compelled to receive all who chose to ride. Can it be that that which has been ever the incident to the business of a common carrier, is sufficient, in these late days, to change, in favor of one common carrier, a private employment into a public use? Should a stage-coach company find it for their advantage to purchase a separate road between two cities for the exclusive use of their own coaches, would such a road, in any just sense, be a public highway? Is not the parallel perfect? The business of the stage coach, like that of the railroad company, is that of a common carrier, and therefore each must transport all who desire. Each has a separate road which it owns, and each occupies the same exclusively, with vehicles. Where is the difference?

But the question arises, what is a public use? Wherein does it differ from a private use? What elements are there which, entering in, assign a use to one or the other class? A surface answer would be that whatever all may use, must be a public use, and that that which only an individual or a class may use, must be a private use. For ordinary purposes these definitions are sufficient, yet a careful examination will show that they are neither exact nor discriminating. For there are many things which all may use, that are not properly classified under the legal term, public uses. Such are hotels, stages, expresses, theaters, circuses, and places of amusement generally. These, whoever desires and tenders the ordinary fee, may use. Yet no one would call these public uses, and some of them many would hardly call public benefits. On the other hand, the executive mansion is free only to the governor, who may use and control it without permitting any other member of the community to enter. True, before every man is the possibility of becoming

governor; but a whole sex is disbarred. Yet who doubts that this is a public use. The terms "public" and "private" do not refer to the amount of use. There is something back of this which distinguishes. Let me suggest two or three rules of distinction between the two classes of uses: And first, whenever any use is founded upon an interest which is individual property, the subject of sale, gift, devise, and bequest, that use must be classed as private. With many public uses are connected interests in individuals, which are valuable to them, and perhaps not inappropriately called their property. Such interests have all public officers, all in public trusts, and in charge of public parks, ways, and buildings. The extent of their interests, the compensation they receive, the benefits they enjoy, may and often do vary with the amount of the use. They may last for a term of years, indefinitely, or even for life. But no matter how valuable or how lasting, they are ever personal, and can neither be sold, given away, devised, nor bequeathed. They lack, therefore, these essential elements of absolute property. They are rather concomitants of, incidents to, the use, than bases for it. The interests are for the benefit of the use; not the use for the benefit of the interests. Their existence in no sense changes the nature of the use from public to private. But where the use is based upon an absolute property-interest in an individual, and is for the benefit of that interest, it is fairly and legally classed as a private use. Take a hotel for example. Private capital builds it—when built it is private property. The thing used belongs absolutely to an individual. Though charge is made for its use, yet all may use it. It is public in the sense that every one tendering the ordinary fee has a right to its use. It is not open to A and closed to B, free to one class and barred to another. Yet no one would hesi-

tate to call that a private use, for it is founded upon an absolute property-interest in an individual, and the profits of it flow into a private purse. Here it may be remarked that the exacting of compensation, by itself considered, throws little light on the question. It is competent for the authorities to demand pay for the use of almost all public property. An admission fee to a public library, public museum, or a toll upon a public road, may lawfully be charged. And on the other hand, the owner of a private park or a private library does not render them public by permitting the public to enter and use them without pay. But when we look beyond the mere receipt of the compensation to the purpose for which it is received, and the direction it takes after receipt, we find an important test. If the compensation is received simply for the purpose of keeping up and improving that which is used, and any surplus is to go into the public treasury to diminish the public burdens, the inference is strong that there is a public use. But if the compensation is exacted with a view to the benefit of a private individual, and the surplus above what is needed for the maintenance of the thing used is to go into a private pocket, the conclusion is irresistible that there exists simply a private use. Again, the right to terminate the use may help to discriminate between private and public uses. If an individual can dictate whether and when the use shall cease, it is a use which exists by his sufferance, and no matter how willing and anxious he may be for all the members of the community to enjoy it, we may well consider it as only a private use. But if the use is not only free to all, but continues at the will of the public, we may properly class it as a public use. Not unfrequently the owners of fine gardens, or choice collections of paintings, open their grounds or galleries to the public; but no one would

dream of calling these public uses and levying taxes for the benefit of the owners, for they have the right at any time to terminate such free use. Tried by either of these tests—and doubtless more might be suggested—a railroad owned by a private corporation, is a private use. It is founded upon an absolute property-interest in an individual. The corporation owns everything. The interest it possesses has all the attributes of absolute property. The corporators may sell, lease, give away, and bequeath it. Even the use, which in one sense, is free to all, is free to the owners in a sense different from that which it is to others. They use it without charge, by right; others, by grace. Again, the tolls exacted over and above the amount necessary for the maintenance of the road, go into the pockets of the individual owners. No matter how large these profits, no portion goes into the public treasury. The purpose of the builders, the object of the work, is private profit, individual gain. And again, the corporators can determine whether and when the road shall be given up, the use shall cease. They may sell the rolling stock, take up the ties and iron, and dispose of them, and release the right of way to the original owners, and no one has power to stop them. The public, which has used it, may desire still to use it, but is at the mercy of the corporation. Yet such a road is classed among "public" uses!

But it is said that it is the duty of the government to furnish means of communication from one part of the State to another; that in discharging this duty, it is not limited to the old-fashioned dirt road, but may make use of the modern appliances for facilitating such communication, and that if individuals take this duty off its hands, it may properly, out of the public funds, assist these individuals in discharging that duty. It is singular evi-

dence of the existence of this duty that the people of
Kansas, in framing their constitution, forbade the State
to discharge it.    Art. XI, § 8 : " The State shall never be
a party in carrying on any works of internal improve-
ment."    But the argument is not good, even if the prem-
ises were true.    It does not follow because a State may
do a certain work as a public improvement, and for the
public use, that it can give of the public funds to a pri-
vate individual, to enable him to do a like work as a pri-
vate speculation and for personal gain.    And this, not-
withstanding the general convenience of the community
is promoted in the one case equally with the other.    For
in the one case the public owns it; the public controls
it; it is public.    In the other, the individual owns it;
the individual controls it; it is private.

Again, it is said that the right of eminent domain is
exercised in behalf of railroads, and that, by virtue
thereof, the owner of real estate is compelled, against his
will, to surrender it to a railroad corporation for the use
of its track; that the sacredness of private property, that
" equal protection," secures to each the free enjoyment
of his property, subject only to the paramount demands
of a public use.    The argument, therefore, is compactly
stated, thus : If private property can only be taken for
public use, and can be taken for the use of a railroad,
the use of a railroad is a public use, and its highway is a
public highway.    Public use upholds taxation—therefore,
taxation in aid of railroads is valid.    The great advan-
tage of this argument is that it bridges over the question,
*What is a public use?*    That underlying question, whose
answer determines the whole case, is conveniently
avoided.    The reverse argument would be equally log-
ical, and the right of eminent domain in favor of rail-
roads supported, because of the exercise of taxation in

their favor.   The rightfulness of each is proved by the existence of the other, without inquiry into the principles upon which either is based.   These rights are not identical. On the contrary they are, in their nature, intrinsically different.   The one is simply the power which the government has to compel a single citizen, under some circumstances, to sell his property.   The other is the power of compelling all citizens to contribute to the support of the government.   · The first does not affect the amount of one's property; it simply changes its form.   The other diminishes the sum of one's wealth.   In the one case the citizen sells his land, and receives its full value in money. In the other he pays his money, and receives nothing except the incidental blessings which the continuance of the government afford.   Selling land, he receives that with which he can buy land elsewhere, or purchase food and clothing.   Paying taxes, he receives nothing with which he can make purchases or secure support.   It is evident the former is a much less trespass on the sacredness of private property than the other.   It is less grievous to compel a man to sell than to give to a railroad.   It is true the power of eminent domain is less frequently invoked than that of taxation.   But frequency of use, and consequent familiarity with, does not determine the grade of power.   Now, rights which· are so distinct in their nature, so different in. their operation and effect, can hardly be founded upon the same principles, or based upon the same necessities.   Some elements must enter in, in the one case, which do not exist in the other.   But it is claimed eminent domain is the higher right, and therefore its existence demonstrates the existence of the lesser—taxation.   But if taxation be, as I have attempted to show, the higher right, this argument fails.   Again, we levy taxes for many objects for which the right of

eminent domain would hardly be claimed.    In *Whiting v. Sheboygan Railway Company*, 25 Wis., 167, Chief Justice Dixon says : "Taxes may be levied to build a State capitol, court house, public school buildings, jails, a state prison, an asylum for the insane, etc.; but recourse to the power of eminent domain to obtain the land upon which to erect such building, would be something new in the legislative and judiciary proceedings of this country." And in *West River Bridge Company v. Dix*, 6 How., 546, Woodbury, J., uses this language: "Who ever heard of laws to condemn private property for public use, for a marine hospital, or state prison? So a custom house is a public use for the general government, and a court house or a jail for a State. But it would be found difficult to find precedent or argument to justify taking private property without consent to erect them on, though appropriate for the purpose." Who would sustain a law seizing and condemning my neighbor's house to public use for an executive mansion, even though it provided full compensation? Yet taxation would be sustained to secure such an object. These many instances in which private property cannot be taken for public use, by virtue of the power of eminent domain, naturally suggest an inquiry as to the correctness of the definition ordinarily given of that power. It is not the right to take private property for public use, as it is ordinarily defined, because in many instances private property cannot be taken for public use, though the full power of eminent domain unquestionably exists in the government. Definitions are the most difficult things in the world to frame, and when framed, dangerous to base arguments upon. But it is evident, from the language used by many jurists, that the power is not limited to cases of public use, but may be invoked in behalf of public benefit. Cooley, in

his work on Constitutional Limitations, p. 524, defines it thus: "More accurately, it is the rightful authority which exists in every sovereignty to control and regulate those rights of a public nature, which pertain to its citizens in common, and to appropriate and *control* individual property for the public *benefit*, as the public safety, necessity, convenience, or welfare, may demand." Chancellor Walworth, 3 Paige, 73, says: "This right of resumption may be exercised, not only where the safety, but also where the interest, or even the expediency of the State, is concerned. If the public interest can be in any way promoted by the taking of private property, it must rest in the wisdom of the legislature to determine whether the *benefit* to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain." "In all such cases the object of the legislative grant of power is the *public benefit* derived from the contemplated improvement, whether such improvement is to be effected directly by the agents of the government, or through the medium of corporate bodies, or of *individual enterprise*." Wood, J., in *Buckingham v. Smith*, 10 Ohio, 296, uses this language: "The principle is founded on the superior claims of a whole community over an individual citizen; but then in these cases only where private property is wanted for *public use*, or demanded by the *public welfare*." In *Fletcher v. Peck*, 6 Cranch, 145 Johnson, J., says: "It amounts to nothing more than a power to oblige him to sell and convey when the public necessities require it." These quotations might be extended, but enough have been made to show that the benefit resulting to the public from a private enterprise, has been considered by eminent jurists sufficient bases to sustain the exercise of eminent domain in its behalf. Whether this be well or ill-founded, if it

be the basis upon which eminent domain, in behalf of private enterprises, has been sustained, the argument, from the exercise of eminent domain to the right of taxation, falls to the ground, for it is agreed taxation can only be for public purposes, and where the public use is subserved.

Mr. Justice COOLEY in the *Detroit & Howell Railroad v. The Town of Salem*, 20 Mich., 452 makes a strong and plausible argument to show that the power of eminent domain is more akin to the police power, than to that of taxation. It seems to me that it is sufficient to show that they are distinct powers, different in nature, and called into exercise under different circumstances. For in the complexities of society and government, it cannot be otherwise than that ofttimes every power is carried far beyond its appropriate limits, and by pursuing the line of argument so much relied on the excesses of one will be the means of enlarging the limits of another.

For these reasons, I think these acts of the legislature authorizing municipalities to extend aid to private railroad corporations cannot be sustained upon principle. My brethren think otherwise, and the question is so settled. The conclusion reached is no hasty one, but the result of long, patient, and careful examination; and the believers in the validity of municipal aid to railroads, may look in vain through the books for an abler presentation of the arguments in their favor than that given by my brother VALENTINE, in the preceding case of *Commissioners of Leavenworth Co. v. Miller;* (ante, p. 487.)